**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

COMMERZBANK AG,

                              Plaintiff,

            -against-

WELLS FARGO BANK, N.A.,

                            Defendant.

---------------------------------------------------------------x

Index No.

**<u>COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF ACTION ................................................................................................. 1

PARTIES ................................................................................................................ 5

JURISDICTION AND VENUE ................................................................................. 9

FACTUAL ALLEGATIONS ..................................................................................... 9

I.      THE SECURITIZATION PROCESS ............................................................... 9

II.     WELLS FARGO'S DUTIES AND OBLIGATIONS ....................................... 11

      A.     Wells Fargo's Duties Pertaining to the Delivery of Mortgage Files .................... 13

      B.     Wells Fargo Had a Duty to Provide Notice of Defaults and
             Enforce Repurchase Obligations Triggered by Such Notice ................................ 18

      C.     Wells Fargo's Duty to Act Prudently
             Upon the Occurrence of an Event of Default ...................................................... 20

      D.     Wells Fargo Had a Duty to Address the
             Servicers' Failure to Meet Prudent Servicing Standards ..................................... 21

      E.     Wells Fargo Is Liable for Negligence in Performing Its Duties .......................... 23

III.    WELLS FARGO BREACHED ITS
       CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES ................... 24

      A.     Wells Fargo Failed to Provide Notice of the Sponsors'
             and Originators' Pervasive Representation and Warranty Breaches .................... 24

            1.     The Originators' and Sponsors' Pervasive
                    Breaches of Representations and Warranties ........................................... 30

      B.     Wells Fargo Failed to Act Prudently
             Upon the Occurrence of an Event of Default ...................................................... 35

            1.     Events of Default Under the PSAs Relating to
                    Document Delivery Failures in the Covered Trusts ................................. 36

            2.     Wells Fargo Received Written Notice of Representation and
                    Warranty Violations Which Ripened into Events of Default ................... 40

       3.     Events of Default Concerning False Servicer Certifications ....................42

    C.    Wells Fargo Failed to Address the Master
          Servicers' and Servicers' Looting of Trust Assets ................................................44

IV.    WELLS FARGO SUFFERED FROM CONFLICTS OF INTEREST.............................47

V.    WELLS FARGO'S CONDUCT INJURED COMMERZBANK ....................................49

CAUSES OF ACTION ........................................................................................................51

FIRST CAUSE OF ACTION (Violations of the TIA) .................................................51

SECOND CAUSE OF ACTION (Breach of Contract) ..................................................53

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) ...........................................54

FOURTH CAUSE OF ACTION (Negligence—
Failure to Avoid Conflict of Interest and Perform Ministerial Acts with Due Care) ...................55

FIFTH CAUSE OF ACTION (Violation of the Streit Act).............................................55

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) .....................................56

PRAYER FOR RELIEF ..........................................................................................................57

Plaintiff Commerzbank AG ("Plaintiff" or "Commerzbank"), by and through its attorneys, brings this action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo", "Defendant", or the "Trustee"), and alleges as follows:

## NATURE OF ACTION

1. This action arises out of Wells Fargo's role as trustee for 19 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against Wells Fargo for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2. The Covered Trusts were created to facilitate residential mortgage-backed securities ("RMBS") transactions introduced to investors from 2005 to 2007. Six of the RMBS transactions were sponsored by Bank of America, N.A. (the "BOA Trusts"), one was sponsored by Citigroup Global Markets Realty Corporation (the "Citi Trust"), one was sponsored by DLJ Mortgage Capital, Inc. (the "DLJ Trust"), four were sponsored by EMC Mortgage Corporation (the "EMC Trusts"), one was sponsored by Morgan Stanley Mortgage Capital Inc. (the "Morgan Stanley Trusts"), one was sponsored by Greenwich Capital Financial Products, Inc. (the "Greenwich Trust"), three were sponsored by WMC Mortgage Corporation (the "WMC Trusts"), one was sponsored by UBS Real Estate Securities Inc. (the "UBS Trust"), and one was sponsored by Option One Mortgage Corporation (the "Option One Trust") (Bank of America, N.A., Citigroup Global Markets Realty Corp., DLJ Mortgage Capital, Inc., EMC Mortgage Corp., Morgan Stanley Mortgage Capital Inc., Greenwich Capital Financial Products, Inc., WMC Mortgage Corp., UBS Real Estate Securities Inc., and Option One Mortgage Corp. are referred to collectively as the

1

"Sponsors").

3.       Commerzbank acquired RMBS certificates with a purchase value in excess of $290 million issued by the Covered Trusts identified in Exhibit B ("the Certificates"). Exhibit B identifies the Certificates Commerzbank still holds (the "Held Certificates") and the Certificates Commerzbank has sold (the "Sold Certificates").

4.       The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.       The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, Wells Fargo, to police the deal and to protect their contractual and other legal rights.

6.       As trustee for the Covered Trusts, Wells Fargo owes Commerzbank and the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts.

Wells Fargo and the relevant servicers (the "Servicers")[1] were required to provide notice of breaches of representations and warranties by the Sponsors and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending. Wells Fargo had a duty to enforce the obligation of the responsible parties (typically the Sponsors, and their affiliates that served as the depositors (the "Depositors")) or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation.  Wells Fargo was also required to address defaults by the Servicers who were required to engage in prudent loss mitigation practices.

7.      Wells Fargo was actively involved in many aspects of the process of securitizing mortgage loans and typically had very close business relationships with the Sponsors, Originators, and Depositors.  Nevertheless, as trustee, Wells Fargo was obligated to act against the financial interest of the Sponsors when demanded by the circumstances. Wells Fargo, however, abandoned its obligations to protect the rights of investors.

8.      Wells Fargo's breaches of its contractual, fiduciary, and statutory duties give rise to six distinct legal claims.

9.      <u>Breach of Contract</u>.  Wells Fargo's contractual duties are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs"). Wells Fargo breached the PSAs by failing to: (i) provide notice of representation and

---

[1] Some of the Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer.  References herein to the Servicer include the Master Servicer to the extent applicable. Additionally, some of the Trusts have Special Servicers as parties to the PSAs.  References herein to the Servicer also include the Special Servicer to the extent applicable.

warranty violations by the Sponsors and Originators; (ii) provide notice of the Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to the Trustee under the PSAs upon the occurrence of an Event of Default.

10.     <u>Breach of Fiduciary Duty</u>.  Under common law, after an "Event of Default" an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders.  This duty continues until the Event of Default is cured.  Wells Fargo failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and address breaches by the Servicers.

11.     <u>Violations of the TIA</u>.  The TIA requires the trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  Wells Fargo violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to Wells Fargo under the PSAs.

12.     <u>Violation of the Streit Act</u>.  Wells Fargo violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of

certificateholders during the pendency of an "event of default".  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.  Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments", the Streit Act provides a similar protection and remedy.

13.     <u>Negligence</u>.  Wells Fargo had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest.  Wells Fargo negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  Wells Fargo violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, and Servicers because if Wells Fargo acted, it would have exposed systemic origination and servicing misconduct and would have jeopardized future lucrative engagements.

14.     <u>Breach of Covenant of Good Faith and Fair Dealing</u>.  Wells Fargo violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, Wells Fargo has caused Commerzbank to suffer in excess of $100 million of losses.

## PARTIES

16.     Plaintiff Commerzbank AG is an entity organized under the laws of Germany.  Commerzbank AG is the legal successor to all of Dresdner Bank AG's ("Dresdner") interests by way of merger as of May 2009, effected by way of universal succession under the German Transformation Act, with Commerzbank AG as the entity resulting from such merger.  Plaintiff brings this action as a current and/or former holder of the Certificates.

Commerzbank's acquisitions and other activities related to the Certificates were conducted at and through Commerzbank AG London Branch (the "London Branch").

17.     Commerzbank acquired certain of the Certificates through assignments from the following investors: (i) investor Barrington II CDO Ltd. ("Barrington 2"), which was a Cayman Islands limited company; (ii) investor Eurohypo AG New York Branch (now known as Hypothekenbank Frankfurt AG New York Branch) ("Eurohypo"), which is a wholly-owned subsidiary of Commerzbank was the New York branch of a corporate entity organized under the laws of Germany; and (iii) investor Palmer Square 3 Limited ("Palmer 3" and together with Barrington 2, and Eurohypo, the "Assignors"), which was a private limited liability company organized under the laws of Ireland.  Exhibit B indicates which Certificates were acquired through assignment from Barrington 2 (the "Barrington 2 Certificates"), Eurohypo (the "Eurohypo Certificates"), and Palmer 3 (the "Palmer 3 Certificates").  Commerzbank brings both its own claims while it was a certificateholder and the claims that were assigned to it by the Assignors.

18.     The Barrington 2 Certificates were acquired as part of the collateral for Barrington 2.  In May 2012, London Branch and Dynamic Credit Partners, LLC ("DCP"), in its capacity as Collateral Manager for Barrington 2, agreed to unwind Barrington 2 whereby DCP would sell the collateral assets and Commerzbank would be presented with the opportunity to purchase them.  In connection with this process, London Branch acquired the Barrington Certificates between May and July 2012.  On December 24, 2013, London Branch entered into an Assignment Agreement with various parties including Barrington 2 and the Bank of New York Mellon Trust Co., N.A. which provided:

> With respect to all assets of the Issuer and the Co-Issuer acquired
> since their respective formations (including, without limitation, any

6

Collateral now owned or previously owned by the Issuer or Co-Issuer under the Indenture, the "Assets"), the Issuer and the Co-Issuer, effective as of the date hereof, hereby transfer and assign to Commerzbank, and the Trustee releases its lien against, any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Assets, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Assets, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the foregoing, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under other contracts to which the Issuer and/or the Co-Issuer is a party (clauses (1) and (2), collectively, the "<u>Transferred Rights</u>") and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions.

19.    On December 11, 2013, Eurohypo and London Branch entered into a

Confirmation of Assignment with respect to the Eurohypo Certificates.  The Confirmation

of Assignment provided:

In exchange for good and valuable consideration, at the time that Eurohypo transferred the Securities to Commerzbank, it was Eurohypo's intent to transfer all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Securities, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Securities, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not include in the forgoing any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under contracts to which Eurohypo is a party, and which concern the

> Securities and all rights and powers necessary to invoke and
> enforce the Transferred rights, including, without limitation, the
> right and authority to commence, prosecute and resolve any legal
> actions (altogether, the "Transferred Rights").

20.    On August 11, 2008, a Deed of Unwind for Palmer 3 effectuated the transfer

of all of Palmer 3's collateral assets, including the Palmer 3 Certificates, to Dresdner, acting

through its London Branch.  The Palmer 3 Certificates were recorded on Dresdner's

accounts in September 2008 (interests for which Commerzbank is legal successor).  By

letter dated December 10, 2013, the liquidator of Palmer 3 provided Commerzbank a letter

confirmation stating:

> With regard to the [unwinding of Palmer 3], this letter
> confirmation further memorializes the fact that is it my
> understanding that it was the Company's intent to effectuate the
> transfer of all assets of value, as provided in the Deed of Unwind,
> to the Sole Noteholder [Dresdner] on the terms set forth in the
> Deed of Unwind, and that such assets included the [Collateral
> Assets], and all legal rights and claims whether in tort or
> otherwise associated with the Collateral Assets.
>
> It is my understanding and belief that such legal rights, and
> claims include, but are not limited to, the Company's interest
> and control over any and all legal claims sounding in tort,
> contract, trust, or otherwise concerning any of the Collateral
> Assets, whether arising before or after the date of their
> acquisition or the date of this confirmation.

21.    Defendant Wells Fargo is a national banking association organized and

existing under the laws of the United States.  Wells Fargo does business throughout the

United States, with its main office located in South Dakota and its principal place of

business in San Francisco, California.  It serves as the trustee for the Covered Trusts.  For each

of the Covered Trusts, Wells Fargo signed Certificates incorporating the PSAs.  As the trustee

for the Covered Trusts, Wells Fargo owed certificateholders certain statutory, contractual, and

fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it

violated.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Wells Fargo resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

24.     This court has personal jurisdiction over Wells Fargo because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the Covered Trusts are New York trusts, with the majority of their governing agreements governed by New York law.

## FACTUAL ALLEGATIONS

### I.      THE SECURITIZATION PROCESS

25.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flows from principal and interest payments on the pool of loans after certain costs and fees are deducted.

26.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as EMC Mortgage Corporation, and the sale of a large

pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

27.     The depositor then conveys the pool of loans to a trustee, such as Wells Fargo, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, Wells Fargo acted as the trustee in connection with the relevant RMBS transactions.

28.     Pursuant to the PSAs, a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

29.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

30.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or

AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the waterfall.

31.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

32.      Wells Fargo earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  Wells Fargo also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts.  Wells Fargo maintained accounts for numerous trusts and earned significant sums from the aggregate balances on these accounts.  The RMBS trustee engagements further deepened Wells Fargo's business relationships with the Sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    <u>WELLS FARGO'S DUTIES AND OBLIGATIONS</u>

33.     Wells Fargo's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  Wells Fargo entered into PSAs with:

> (A) For one of the BOA Trusts (ABFC 2005-HE2): (i) Asset Backed Funding Corp., as Depositor; and (ii) Saxon Mortgage Services, Inc., as Servicer;
>
> (B) For three of the BOA Trusts (ABFC 2005-OPT1, ABFC 2006-OPT1, and ABFC 2006-OPT2): (i) Asset Backed Funding Corp., as Depositor; and (ii) Option One Mortgage Corp., as Servicer;

(C) For one of the BOA Trusts (BAFC 2005-C): (i) Banc of America Funding Corp., as Depositor; and (ii) Greenpoint Mortgage Funding, Inc., as Servicer;

(D) For one of the BOA Trusts (BOAMS 2006-B): (i) Banc of America Mortgage Securities, Inc., as Depositor; and (ii) Bank of America, N.A., as Servicer;

(E) For the DLJ Trust (ABSHE 2005-HE5): (i) Asset Backed Funding Corp., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) DLJ Mortgage Capital, Inc., as Seller; and (iv)Mortgageramp Inc., as Loan Performance Advisor;

(F) For the Citi Trust (CMLT 2005-OPT4): (i) Citigroup Mortgage Loan Trust Inc., as Depositor; and (ii) Option One Mortgage Corp., as Servicer;

(G) For one of the EMC Trusts (GPMF 2006-AR1): (i) Bear Stearns Asset Backed Securities I LLC, as Depositor; and (ii) EMC Mortgage Corp., as Servicer, Sponsor, and Company;

(H) For three of the EMC Trusts (GPMF 2005-AR4, GPMF 2006-AR2, and GPMF 2006-AR3): (i) Structured Asset Mortgage Investments II Inc., as Depositor; and (ii) EMC Mortgage Corp., as Servicer, Sponsor, and Company;

(I) For the Greenwich Trust (HVMLT 2007-3): (i) Greenwich Capital Acceptance, Inc., as Depositor; (ii) Greenwich Capital Financial Products, Inc., as Seller; and (iii) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(J) For the UBS Trust (MABS 2007-NCW): (i) UBS Real Estate Securities Inc., as sponsor; and (ii) Countrywide Home Loans Servicing LP, as Servicer;

(K) For two of the WMC Trusts (MSAC 2005-WMC3 and MSAC 2005-WMC5): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; and (iii) WMC Mortgage Corp., as Responsible Party;

(L) For one of the WMC Trusts (MSAC 2005-WMC2): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) Deutsche Bank National Trust Company, as Custodian; and (iv) WMC Mortgage Corp., as Responsible Party;

(M) For the Option One Trust (OOMLT 2006-2): (i) Option One Mortgage Acceptance Corp., as Depositor; and (ii) Option One Mortgage Corp., as Master Servicer; and

(N) For the Morgan Stanley Trust (MSAC 2006-HE1): (i) Morgan Stanley Capital Inc., as Depositor; (ii) JP Morgan Chase Bank, N.A., as Servicer; (iii) WMC Mortgage Corp., as Responsible Party; and (iv) LaSalle Bank, N.A., as Custodian.

**A.     Wells Fargo's Duties Pertaining to the Delivery of Mortgage Files**

34.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to Wells Fargo in its capacity as the trustee for the Covered Trusts to hold for the benefit of the certificateholders.  This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans to Trustee") of the EMC PSA,[2] which provides in relevant part:

> The Depositor, concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to (i) the Mortgage Loans identified in the Mortgage Loan Schedule, including all interest due and principal received with respect to the Mortgage Loans after the Cut-off Date but excluding any payments of interest due on or prior to the Cut-off Date; (ii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Custodial Account, (iii) such assets relating to the Mortgage Loans as from time to time may be held by the Trustee in the Distribution Account, (iv) such assets relating to the Mortgage Loans as from time to time may be held by the Trustee in the Final Maturity Reserve Account, (v) any REO Property, (vi) the Required Insurance Policies and any amounts paid or payable by the insurer under any Insurance Policy (to the extent the mortgagee has a claim thereto), (vii) the Mortgage Loan Purchase Agreement to the extent provided in Section 2.03(a), (viii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to any of the Accounts and (ix) any proceeds of the foregoing.

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC

---

[2] Quotations to the EMC PSA herein are to the PSA executed in connection with the GPMF 2006-AR3 securitization.  The other EMC Trusts were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Complaint.

Trusts set forth a substantially similar process.[3]  *See* Ex. C § I.

35.    In addition, Section 2.02 of the EMC PSA ("Acceptance of Mortgage Loans by Trustee") provides that Wells Fargo, or a custodian on behalf of Wells Fargo, is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders.  It provides:

> The Trustee (on behalf of the Trust) acknowledges the sale, transfer and assignment of the Trust Fund to it by the Depositor and receipt of, subject to further review and the exceptions which may be noted pursuant to the procedures described below, and declares that it holds, the documents (or certified copies thereof) delivered to it or the Custodian, as its agent, pursuant to Section 2.01, and declares that it will continue to hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it as Trustee in trust for the use and benefit of all present and future Holders of the Certificates.

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC Trusts set forth a substantially similar process.  *See* Ex. C § II.

36.    Section 2.01(b) of the EMC PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides:

> In connection with the above transfer and assignment, the Sponsor hereby deposits with the Trustee or the Custodian, as its agent, with respect to each Mortgage Loan:
>
> (i) the original Mortgage Note, endorsed without recourse (A) to the order of the Trustee or (B) in the case of a Mortgage Loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or lost note affidavit together with a copy of the related Mortgage Note,
>
> (ii) the original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or if the original is not available, a copy), with

---

[3] Upon information and belief, the UBS Trust contains substantially similar PSA provisions as those cited herein.  As the UBS Trust was a non-public offering, its PSA is not publicly available.

14

evidence of such recording indicated thereon (or if clause (w) in the proviso below applies, shall be in recordable form),

(iii) unless the Mortgage Loan is a MOM Loan, a certified copy of the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to "Wells Fargo Bank, National Association, as Trustee", with evidence of recording with respect to each Mortgage Loan in the name of the Trustee thereon (or if clause (w) in the proviso below applies or for Mortgage Loans with respect to which the related Mortgaged Property is located in a state other than Maryland, Tennessee, South Carolina, Mississippi and Florida, or an Opinion of Counsel has been provided as set forth in this Section 2.01(b), shall be in recordable form),

(iv) all intervening assignments of the Security Instrument, if applicable and only to the extent available to the Depositor with evidence of recording thereon,

(v) the original or a copy of the policy or certificate of primary mortgage guaranty insurance, to the extent available, if any,

(vi) the original policy of title insurance or mortgagee's certificate of title insurance or commitment or binder for title insurance, and

(vii) originals of all modification agreements, if applicable and available. . . .

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC Trusts set forth a substantially similar process. *See* Ex. C § III.

37.     Physical possession of these documents by Wells Fargo was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

38.     Wells Fargo had a contractual obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.

39.     After a designated period, Wells Fargo, or a custodian on its behalf, was

required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § IV.  When a custodian fulfilled this role, it acted as an agent or on behalf of the Trustee.  For example, the EMC PSA provides that "[t]he Trustee may execute any of the trusts or powers [under the Agreement] or perform any duties hereunder either directly or by or through Affiliates, agents or attorneys; provided, however, that the Trustee may not appoint any agent (other than the Custodian) to perform its custodial functions with respect to the Mortgage Files . . ." (emphasis in original.)  The PSAs for the BOA, Citi, DLJ, Greenwich, Option One, and WMC Trusts contain substantially similar provisions.  *See* Ex. C § XIII.

40.     The "Form of Custodian Final Certification," which was attached to the EMC PSA as Exhibit G, provides:

> Ladies and Gentlemen:
>
> In accordance with Section 2.3 of the above-captioned Custodial Agreement and subject to Section 2.02(b) of the Pooling and Servicing Agreement, the undersigned, as Custodian, hereby certifies that, subject to any exceptions listed on Schedule A attached hereto, it has received a Mortgage File with respect to each Mortgage Loan listed in the Mortgage Loan Schedule containing with respect to each such Mortgage Loan:
>
> (i) The original Mortgage Note, endorsed without recourse (A) to the order of the Trustee or (B) in the case of a Mortgage Loan in the MERS System, in blank, and in each case showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee or a lost note affidavit together with a copy of the related Mortgage Note;
>
> (ii) the original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon;
>
> (iii) unless the Mortgage Loan is a MOM Loan, a certified copy of

16

the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to A Wells Fargo Bank, National Association, as Trustee@, with evidence of recording with respect to each Mortgage Loan in the name of the Trustee thereon;

(iv) all intervening assignments of the Security Instrument, if applicable and only to the extent available to the Seller with evidence of recording thereon;

(v) the original or a copy of the policy or certificate of primary mortgage guaranty insurance, to the extent available, if any,

(vi) the original policy of title insurance or mortgagee=s certificate of title insurance or commitment or binder for title insurance, and

(vii) originals of all modification agreements, if applicable and available.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement or in the Pooling and Servicing Agreement, as applicable.

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC Trusts set forth a substantially similar process. *See* Ex. C § V.

41. The final certification is the key certification that Wells Fargo (or a custodian on its behalf) was required to prepare for the Covered Trusts. In this document, Wells Fargo certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) Wells Fargo had not obtained complete required documentation for those loans identified on the document exception report.

42. If there was a defect with any mortgage file, then Wells Fargo and/or the Servicer was obligated to demand that the Sponsor cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans. This is set forth in

Section 2.02 of the EMC PSA, which provides:

> If the Trustee or the Custodian, as its agent, finds any document
> constituting part of the Mortgage File has not been executed or
> received, or to be unrelated, determined on the basis of the
> Mortgagor name, original principal balance and loan number, to the
> Mortgage Loans identified in Exhibit B, or to appear defective on
> its face (a "Material Defect"), the Trustee or the Custodian, as its
> agent, shall promptly notify the Sponsor. In accordance with the
> Mortgage Loan Purchase Agreement the Sponsor shall correct or
> cure any such defect within ninety (90) days from the date of notice
> from the Trustee or the Custodian, as its agent, of the defect and if
> the Sponsor fails to correct or cure the defect within such period,
> and such defect materially and adversely affects the interests of the
> Certificateholders in the related Mortgage Loan, the Trustee or the
> Custodian, as its agent, shall enforce the Sponsor's obligation
> pursuant to the Mortgage Loan Purchase Agreement within 90 days
> from the Trustee's or the Custodian's notification. . . .

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC

Trusts contain a substantially similar form of final certification. *See* Ex. C § VI.

43. Under all of the PSAs, and applicable tax laws governing REMICS, the

responsible party could not cure a document defect by substitution after a specified period,

typically 540 days to two years from closing. *See* Ex. C § VII.

**B. Wells Fargo Had a Duty to Provide Notice of Defaults
and Enforce Repurchase Obligations Triggered by Such Notice**

44. Wells Fargo had an obligation pursuant to the PSAs to provide notice to all

parties of the Servicers', Sponsors', or Originators' breaches of representations and

warranties under the PSAs or the mortgage loan purchase agreements ("MLPAs"). For

example, Section 2.03 of the EMC PSA provides:

> If the Depositor, the Servicer or the Trustee discovers a breach of
> any of the representations and warranties set forth in the Mortgage
> Loan Purchase Agreement, which breach materially and adversely
> affects the value of the interests of Certificateholders or the Trustee
> in the related Mortgage Loan, the party discovering the breach shall
> give prompt written notice of the breach to the other parties. The

18

> Sponsor, within 90 days of its discovery or receipt of notice that
> such breach has occurred (whichever occurs earlier), shall cure the
> breach in all material respects or, subject to the Mortgage Loan
> Purchase Agreement or Section 2.04 of this Agreement, as
> applicable, shall purchase the Mortgage Loan or any property
> acquired with respect thereto from the Trust; provided, however,
> that if there is a breach of any representation set forth in the
> Mortgage Loan Purchase Agreement or Section 2.04 of this
> Agreement, as applicable, and the Mortgage Loan or the related
> property acquired with respect thereto has been sold, then the
> Sponsor shall pay, in lieu of the Repurchase Price, any excess of the
> Repurchase Price over the Net Liquidation Proceeds received upon
> such sale. If the Net Liquidation Proceeds exceed the Repurchase
> Price, any excess shall be paid to the Sponsor to the extent not
> required by law to be paid to the borrower.

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC

Trusts contain substantially similar provisions. *See* Ex. C § VI.

45. In addition, after the occurrence of an Event of Default, the Trustee assumes

the same duties as a common law trustee, which includes, among other things, providing

beneficiaries notice of all defaults under the operative trust documents, which include the

PSAs here.

46. Congress also enacted the TIA to ensure, among other things, that investors in

certificates, bonds, and similar instruments, have adequate rights against, and receive

adequate performance from, the responsible trustees. 15 U.S.C. § 77bbb.

47. Under Section 315(b) of the TIA, Wells Fargo was required to give

certificateholders notice of a default under the PSAs within 90 days of learning of such

default. 15 U.S.C. § 77ooo(b).

48. As set forth below in Section III, Wells Fargo failed to give notice of

numerous defaults and breaches of representations and warranties or covenants as required

under the PSAs, common law, and the TIA.

C.     **Wells Fargo's Duty to Act Prudently**
       **Upon the Occurrence of an Event of Default**

49.     Under the PSAs and applicable law, Wells Fargo owed a fiduciary duty to

certificateholders upon the occurrence of an Event of Default.  Wells Fargo's post-default

fiduciary duty is described in Section 9.01 of the EMC PSA, which provides in relevant

part, "[i]f an Event of Default has occurred . . . the Trustee shall exercise such of the rights

and powers vested in it by this Agreement, and . . . use the same degree of care and skill in

their exercise, as a prudent person would exercise under the circumstances in the conduct of

his own affairs."  The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option

One, and WMC Trusts impose substantially similar obligations on Wells Fargo.  *See* Ex. C §

VII.

50.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a

"default" the indenture trustee must exercise such of the rights and powers vested in it by

the indenture, and must use the same degree of care and skill in their exercise as a prudent

man would exercise or use under the circumstances in the conduct of his own affairs.  15

U.S.C. § 77ooo(c).

51.     The Streit Act provides that upon the occurrence of an event of default, an

indenture trustee must exercise such of the rights and powers vested in it by the indenture,

and must use the same degree of care and skill in their exercise as a prudent man would

exercise or use under the circumstances in the conduct of his own affairs.

52.     A prudent trustee would have taken appropriate steps to ensure all mortgage loan

documentation was completely and accurately transferred to the trusts.  A prudent trustee also

would have ensured that the appropriate parties were receiving notification of breaches of

representations and warranties from servicers and master servicers and enforced the responsible

parties' obligations with respect to breaching mortgage loans.  As set forth in Section III

hereof, Wells Fargo failed to exercise its duties both prior to and after the occurrence of

defaults and Events of Default.

> **D.     Wells Fargo Had a Duty to Address the
> Servicers' Failure to Meet Prudent Servicing Standards**

53.     Each PSA required the Servicers to service the loans underlying the Covered

Trusts prudently.

54.     For example, Section 3.01 of the EMC PSA provides:  "[t]he Servicer shall

service and administer the Mortgage Loans in accordance with this Agreement and with

Accepted Servicing Practices and shall have full power and authority . . . to do or cause to

be done any and all things in connection with such servicing and administration . . . and

shall exercise the same care that it customarily employs for its own account."  The PSAs for

the BOA, Citi, DLJ, Morgan Stanley, Option One, and WMC Trusts contain substantially

similar requirements.  *See* Ex. C § VIII.

55.     The PSAs provide that the failure to meet prudent servicing standards is an

Event of Default if left uncured for a designated period of time after notice of the default.

For example, Section 8.01 of the EMC PSA provides that an Event of Default is triggered

when:

> The Servicer fails to observe or perform in any material respect any
> other material covenants and agreements set forth in this Agreement
> to be performed by it, which covenants and agreements materially
> affect the rights of Certificateholders, and such failure continues
> unremedied for a period of 60 days after the date on which written
> notice of such failure, properly requiring the same to be remedied,
> shall have been given to the Servicer by the Trustee or to the
> Servicer and the Trustee by the Holders of Certificates evidencing
> Fractional Undivided Interests aggregating not less than 25% of the
> Trust Fund….

The PSAs for the BOA, Citi, DLJ, Morgan Stanley, Greenwich, Option One, and WMC Trusts contain substantially similar provisions.  *See* Ex. C § IX.

56.     Further, the PSAs for the BOA, Citi, DLJ, Morgan Stanley, Option One, and WMC Trusts provide that the failure to follow prudent servicing standards is also an Event of Default typically 30 days after a servicing officer becomes aware of such breach, without regard to whether notice is provided.  *See* Ex. C § IX.

57.     Upon a Servicer default or Event of Default, the Trustee was obligated to act. Wells Fargo had a duty to provide notice when it became aware of breaches of the PSAs by the Servicers.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, Section 8.01 of the EMC PSA provides that once a Servicer Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations (but not the liabilities) of the Servicer," and "all authority and power of the Servicer under this Agreement . . . shall, subject to Section 8.02, automatically and without further action pass to and be vested in the Trustee. . . ."  The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC Trusts impose substantially similar obligations on Wells Fargo.  *See* Ex. C § X.  More generally, Wells Fargo, as Trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

58.     As set forth below in Section III, Wells Fargo breached its statutory, fiduciary, and contractual duties by failing to take actions to address Servicer defaults and Events of Default.

### E.      Wells Fargo Is Liable for Negligence in Performing Its Duties

59.      Section 9.01 of the EMC PSA provides in relevant part:

> ***No provision of this Agreement shall be construed to relieve the
> Trustee from liability for its own negligent action***, its own
> negligent failure to act or its own willful misconduct; <u>provided</u>,
> <u>however</u>, that:

> (i) Prior to the occurrence of an Event of Default, and after the
> curing or waiver of all such Events of Default which may have
> occurred, the duties and obligations of the Trustee shall be
> determined solely by the express provisions of this Agreement, the
> Trustee shall not be liable except for the performance of its duties
> and obligations as are specifically set forth in this Agreement, no
> implied covenants or obligations shall be read into this Agreement
> against the Trustee and, in the absence of bad faith on the part of the
> Trustee, the Trustee may conclusively rely, as to the truth of the
> statements and the correctness of the opinions expressed therein,
> upon any certificates or opinions furnished to the Trustee and
> conforming to the requirements of this Agreement

> (ii) The Trustee shall not be liable in its individual capacity for
> an error of judgment made in good faith by a Responsible Officer
> or Responsible Officers of the Trustee, ***unless it shall be proved
> that the Trustee was negligent in ascertaining the pertinent
> facts***. . . .

(Emphasis added.)  The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option

One, and WMC Trusts contain substantially similar provisions.  *See* Ex. C § VII.

60.      Every trustee also has a non-waivable duty to exercise due care in the

performance of ministerial acts required to be undertaken in the course of the administration

of the trust.  Wells Fargo can be held liable for its own negligence in failing to perform its

requisite ministerial acts, which includes, among other things, its responsibilities to: (i) give

notice to all parties to the PSAs of the breach of representations and warranties relating to

the mortgage loans once it discovered the Sponsors' widespread practice of including in

securitization trusts loans that breached such representations and warranties; and (ii) provide

23

notices of servicing related breaches known to the Trustee.

61.     Every trustee—including Wells Fargo—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

## III.    WELLS FARGO BREACHED ITS CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES

### A.    Wells Fargo Failed to Provide Notice of the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

62.     Wells Fargo failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

63.     For example, for the EMC Trusts, EMC Mortgage Corp. represented and warranted in its MLPA the following:

> (i) the information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects and the information provided to the Rating Agencies, including the Mortgage Loan level detail, is true and correct according to the Rating Agency requirements;
>
> (ii) immediately prior to the transfer to the Purchaser, the Mortgage Loan Seller was the sole owner of beneficial title and holder of each Mortgage and Mortgage Note relating to the Mortgage Loans and is conveying the same to the Purchaser free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges or security interests of any nature and the Mortgage Loan Seller has full right and authority to sell or assign the same pursuant to this Agreement;
>
> (iii) each Mortgage Loan at the time it was made complied in all material respects with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity,

disclosure and recording laws and all predatory lending laws; and each Mortgage Loan has been serviced in all material respects in accordance with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all predatory lending laws and the terms of the related Mortgage Note, the Mortgage and other loan documents; . . .

(v) the terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, (i) if required by law in the jurisdiction where the Mortgaged Property is located, or (ii) to protect the interests of the Trustee on behalf of the Certificateholders; . . .

(xiii) a lender's title insurance policy (on an ALTA or CLTA form) or binder, or other assurance of title customary in the relevant jurisdiction therefor in a form acceptable to Fannie Mae or Freddie Mac, was issued on the date that each Mortgage Loan was created by a title insurance company which was qualified to do business in the jurisdiction where the related Mortgaged Property is located, insuring the Mortgage Loan Seller and its successors and assigns that the Mortgage is a first priority lien on the related Mortgaged Property in the original principal amount of the Mortgage Loan. The Mortgage Loan Seller is the sole insured under such lender's title insurance policy, and such policy, binder or assurance is valid and remains in full force and effect, and each such policy, binder or assurance shall contain all applicable endorsements including a negative amortization endorsement, if applicable;

(xiv) at the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan. . .

(xxiv) each Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator;   . . .

(xxvi) the related Mortgage File contains each of the documents and instruments listed in Section 2.01 of the Pooling and Servicing Agreement, subject to any exceptions, substitutions and qualifications as are set forth in such Section;

(xxvii) the Mortgage Loans are currently being serviced in accordance with accepted servicing practices;

(xxviii) at the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting

> requirements of the originator of the Mortgage Loan, and the
> appraisal is in a form which was acceptable to Fannie Mae or
> FHLMC at the time of origination. . . .

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC

Trusts contain substantially similar provisions.  *See* Ex. C § XI.

64.      As noted above in Section II(B), each party, including the Trustee, had an

obligation to provide notice of breaches of these representations and warranties and such

notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the

defective loan.  *See also* Ex. C § VI.

65.      Wells Fargo knew that the Sponsors and Originators regularly disregarded their

underwriting guidelines and representations and warranties made to securitization trusts long

before certificateholders learned of such problems.

66.      Wells Fargo served as trustee for hundreds, if not thousands, of RMBS trusts from

2004 to 2007, including many transactions involving the Sponsors and Originators.  In the course

of administering these trusts, Wells Fargo learned that the Sponsors and Originators had departed

from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage

loans complied with state and federal laws.

67.      For example, while serving as trustee for various RMBS trusts, Wells Fargo was

presented with a large number of defaulted loans that were originated by the Sponsors and

Originators, and foreclosures were commenced often in Wells Fargo's name.

68.      Indeed, Wells Fargo commenced foreclosure actions from 2005 to 2010 for

numerous loans in which the Sponsors or Originators were at issue, including, for example,

foreclosure actions in which:

> (a)      WMC Mortgage Corporation served as Originator.  *See, e.g.*, *Wells Fargo
> Bank, N.A. as Trustee v. Papai, et al.*, 2005-10-6312 (C.P. Summit Cnty.

2005); *Wells Fargo Bank, N.A. as Trustee v. Brown*, 10100518 (N.Y. Sup. Ct. 2010); and

(b)    Option One Mortgage Corp served as Originator. *See, e.g., Wells Fargo Bank, N.A. v. Heath*, No. 108,383, 280 P.3d 328 (Sup. Ct. Okla. 2012) (underlying foreclosure commenced in 2008); *Wells Fargo Bank, N.A. v. Bohatka*, 112 So. 3d 596 (Fla. 1st DCA 2013).

69.    Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized. In each foreclosure, Wells Fargo was the named plaintiff and real party in interest as it allegedly held title to the notes and mortgage as trustee for the benefit of the certificateholders. As the real party in interest it had knowledge of the contents of the foreclosure filings.

70.    Through its review of these filings, Wells Fargo knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

71.    Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts. These facts, some of which are detailed in Exhibit F, demonstrate that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines. While investors such as Commerzbank lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Wells Fargo had knowledge of specific problems with specific loans as well as access to the mortgage loan files. At a minimum, in its role as trustee to hundreds of RMBS trusts, Wells Fargo was

27

privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, Wells Fargo had statutory and common law duties requiring them to "nose to the source."

72.     Wells Fargo also commenced repurchase actions against the Sponsors or Originators at issue here.  For example, at the direction of certain certificateholders, Law Debenture Trust Company, in its role as Separate Trustee as appointed by Wells Fargo, commenced actions against WMC Mortgage Corp. (the Originator of loans for one of the Covered Trusts) to compel repurchase of loans that breached representations and warranties. *See, e.g.*, Compl., *Law Debenture Trust Co. of New York v. WMC Mortg. LLC*, No. 12-cv-01538 (D. Conn. Oct. 2006).  In a similar repurchase action, Law Debenture Trust Company, acting on behalf of Wells Fargo, through a forensic review determined the existence of "rampant breaches of representations and warranties" for loans originated, and sold into RMBS, by EMC Mortgage LLC—the Sponsor of several Covered Trusts at issue.  *Bear Stearns Funding Trust 2007-AR4 v. EMC Mortg. LLC*, 2014 WL 494219, *5 (Del. Ch. 2014) (forensic review found breaches of representations and warranties in approximately 86 percent of the Mortgage Loans reviewed); *see also*, *Bear Stearns Mortg. Funding Trust 2006-AR1 v. EMC Mortgage LLC*, 2012 WL 2602942, ¶ 44 (Del. Ch. 2012) (same).

73.     Wells Fargo also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

74.     Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  Sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.

28

The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan Sponsor and the parties to the agreement, including the trustee.

75.     Monoline insurers have filed many complaints against Sponsors and Originators for breaches of their representations and warranties in RMBS trusts, including the Covered Trusts.  *See, e.g.,* Compl., *Ambac Assurance Corp. v. EMC Mortg. LLC*, No. 651013/2012 (N.Y. Sup. Ct. 2012) (GPMF 2006-AR3).

76.     Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue and informed the trustee of the results.

77.     Because these monoline insurers' findings from loan level reviews set forth in their breach notices reflected these common mortgage sellers' pervasive violations of underwriting and securitization guidelines, Wells Fargo discovered, or should have discovered if it was carrying out its duties, that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

78.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both the state and federal level and the non-public information that Wells Fargo received through its role as trustee, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible partys' representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on

the performance of the Covered Trusts.  Many of the Certificates acquired by Commerzbank were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now most are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high default and delinquency rates is attached as Exhibit E.  Wells Fargo was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including Commerzbank, of the issues, and taken action to address these issues.

79.     If Wells Fargo had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  Wells Fargo had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee.  Indeed, Wells Fargo let the statute of limitations to bring repurchase claims lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1.     The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

80.     Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts.

81.     The failure of the parties to the PSAs to provide notice of breaches of representations and warranties constituted a default that would have ripened into Events of Default had Wells Fargo provided notice of the defaults.

82.     The chart below identifies each of the entities disclosed to be the Sponsors,

Originators, and obligors of the loans included in the Covered Trusts.[4]

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 1 | ABFC 2005-HE2 | Bank of America, N.A. | WMC Mortgage Corp.; Ownit Mortgage Solutions | WMC Mortgage Corp.; Ownit Mortgage Solutions; Bank of America, N.A. |
| 2 | ABFC 2005-OPT1 | Bank of America, N.A. | Option One Mortgage Corp. | Option One Mortgage Corporation; Bank of America, N.A. |
| 3 | ABFC 2006-OPT1 | Bank of America, N.A. | Option One Mortgage Corp. | Option One Mortgage Corporation; Bank of America, N.A. |
| 4 | ABFC 2006-OPT2 | Bank of America, N.A. | Option One Mortgage Corp. | Option One Mortgage Corporation; Bank of America, N.A. |
| 5 | ABSHE 2005-HE5 | DLJ Mortgage Capital, Inc. | WMC Mortgage Corp. | WMC Mortgage Corp.; DLJ Mortgage Capital, Inc.; or Asset Backed Securities Corp. |
| 6 | BAFC 2005-C | Bank of America, N.A. | GreenPoint Mortgage Funding, Inc. | Bank of America, N.A., GreenPoint Mortgage Funding, Inc., Banc of America Funding Corp. |

---

[4] Upon information and belief, New Century Mortgage Corporation is the originator for the MABS 2007-NCW securitization, but the relevant offering materials are not publicly available.

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 7 | BOAMS 2006-B | Bank of America, N.A. | Bank of America, N.A. | Banc of America Mortgage Securities, Inc. |
| 8 | CMLTI 2005-OPT4 | Citigroup Mortgage Loan Trust Inc., | Option One Mortgage Corp. | Option One Mortgage Corporation; Citigroup Global Markets Realty Corp., |
| 9 | GPMF 2005-AR4 | EMC Mortgage Corp. | GreenPoint Mortgage Funding, Inc. | EMC Mortgage Corp. |
| 10 | GPMF 2006-AR1 | EMC Mortgage Corp. | GreenPoint Mortgage Funding, Inc. | EMC Mortgage Corp. |
| 11 | GPMF 2006-AR2 | EMC Mortgage Corp. | GreenPoint Mortgage Funding, Inc. | EMC Mortgage Corp. |
| 12 | GPMF 2006-AR3 | EMC Mortgage Corp. | GreenPoint Mortgage Funding, Inc. | EMC Mortgage Corp. |
| 13 | HVMLT 2007-3 | Greenwich Capital Financial Products, Inc. | Paul Financial, LLC; SunTrust Mortgage, Inc.; ComUnity Lending, Inc.; Just Mortgage, Inc. | Paul Financial, LLC; SunTrust Mortgage, Inc.; ComUnity Lending, Inc.; Just Mortgage, Inc. |
| 14 | MSAC 2005-WMC2 | WMC Mortgage Corp. | WMC Mortgage Corp. | WMC Mortgage Corp. |
| 15 | MSAC 2005-WMC3 | WMC Mortgage Corp. | WMC Mortgage Corp. | WMC Mortgage Corp. |
| 16 | MSAC 2005-WMC5 | WMC Mortgage Corp. | WMC Mortgage Corp. | WMC Mortgage Corp. |

|  | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 17 | MSAC 2006-HE1 | Morgan Stanley Mortgage Capital Inc. | WMC Mortgage Corp.; Decision One Mortgage Company, LLC | WMC Mortgage Corp.; Decision One Mortgage Company, LLC |
| 18 | OOMLT 2006-2 | Option One Mortgae Acceptance Corp. | Option One Mortgage Corp. | Option One Mortgage Corp. |

83.     As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

84.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  *See, e.g.,* Compl., *Cambridge Place v. Morgan Stanley & Co.*, 10-2741 (Sup Ct. Mass. June 9, 2010) (alleging Morgan Stanley's faulty securitization practices led to inclusion of high percentage of defective loans securitized in five Covered Trusts at issue here: ABFC 2006-OPT2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, and MSAC 2006-HE1); Compl., *Federated Inv. v. Countrywide*, No. BC465659 (Cal. Sup. Ct. 2011) (alleging Bank of America's faulty securitization practices led to inclusion of high percentage of defective loans securitized on BOAMS shelf); Compl., *FHFA v. Morgan Stanley*, 11-cv-06739 (S.D.N.Y. Sept. 26, 2011) (alleging claims concerning systemic abandonment of underwriting guidelines for RMBS issued from, among others, the MSAC shelf); Compl., *FHFA v. Credit Suisse Securities (USA) LLC*, 13-cv-06736 (S.D.N.Y. Sept. 23, 2011) (alleging claims concerning systemic abandonment of underwriting guidelines for RMBS issued from, among others, the ABSHE shelf).  These investigations and lawsuits contain ample evidence available to Wells

Fargo that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

85.     Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  For example, in *FHFA v. Bank of America*, No. 11-cv-06195 (S.D.N.Y.), the Federal Housing Finance Agency ("FHFA") conducted a review of two of the BOA Trusts at issue here: ABFC 2006-OPT1 and ABFC 2006-OPT2.  The FHFA's review of these Covered Trusts revealed that Bank of America's representations regarding the true percentage of non-owner occupied loans within the loan pool were materially inaccurate, understating the percentage of non-owner occupied properties by between 7-10 percent.  The forensic review also revealed that the mortgage loans for each securitization had misrepresented loan-to-value ("LTV") ratios between 10-20 percent of the mortgages.  For ABFC 2006- OPT1, the data review revealed that more than 20 percent of the mortgages in the sampled loan group had a true LTV ratio over 100 percent.

86.     Loan-level analyses conducted in connection with investigations of other Sponsors and Originators of the Covered Trusts uncovered similar results.  *See, e.g., Federal Deposit Ins.Corp. v. J.P. Morgan Sec. LLC*, 12-cv-00878 (W.D. Tex. Nov. 19, 2012) (GPMF 2006-AR3); *FHFA v. JPMorgan Chase & Co.*, 11-cv-06188 (S.D.N.Y. 2012) (GPMF 2006-AR3); *FHFA v. Royal Bank of Scotland Group PLC*, 11-cv-01383 (D. Conn. 2012) (HVMLT 2007-3).

87.     Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the borrower's ability to repay the loan, and regularly made exceptions to underwriting guidelines in

the absence of sufficient compensating factors.  For example one of the BOA Trusts (ABFC 2006-OPT2), contained a loan for $560,000 that Option One Mortgage Corp. provided to a borrower who was unemployed, and had stated debt payments (which did not include borrower's monthly expenses for things such as taxes, utilities, groceries, health care, and transportation) far in excess of monthly income.

88.     These lawsuits, in conjunction with the poor performance of the underlying loans (which Wells Fargo was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among Originators, were more than sufficient to provide Wells Fargo with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

89.     Wells Fargo was aware of these reports, investigations, and lawsuits, and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts.  Additionally, Wells Fargo had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if it had conducted even a limited investigation.  Thus, Wells Fargo was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.     Wells Fargo Failed to Act Prudently
        Upon the Occurrence of an Event of Default**

90.     When Wells Fargo learned that the Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, Wells Fargo should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified certificateholders of the Servicers' defaults and the breaches of representation and warranty provisions.  During the

35

period that an Event of Default was in existence, Wells Fargo had a continuing duty to enforce repurchase rights. As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans. Wells Fargo continually failed to do so and let the statute of limitations to bring repurchase claims lapse or otherwise failed to fulfill its obligation to seek repurchases by failing to take sufficient action within six years of the closing of each Covered Trust.

91.    Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), Wells Fargo was aware (or would have been aware if it had carried out its duties) that the Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts. Wells Fargo, however, did not provide notice of such breaches as it was required to do. Because these would have seasoned into Events of Default if notice had been provided, Wells Fargo had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

92.    As described below, additional Events of Default occurred under the terms of the PSAs. Wells Fargo has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

93.    As discussed above in Section II(A), Wells Fargo, or a custodian acting on its behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically

36

include documents sufficient to prove ownership of the note and mortgage or otherwise

protect title.  Wells Fargo knew of numerous instances where it did not receive: (i) the

original mortgage note with all intervening endorsements showing a complete chain of

endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note

affidavit and a duly executed assignment of mortgage for each loan that was not a MERS

loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the

original mortgage for those loans that were MERS loans; or (iv) the original recorded

assignment or assignment of the mortgage together with all interim recorded assignments

and the original lender's title policy.

94.    When Wells Fargo prepared the final exception reports, it provided them to

the Sponsors, Depositors, and Servicers indicating many of these missing documents.  When

the custodian prepared such reports, it provided them to Wells Fargo, the Sponsors,

Depositors, and Servicers, and the reports similarly showed many documents that were

required to be delivered under the PSAs were not delivered.  Wells Fargo was aware that

affected loans were not repurchased or substituted.

95.    Rather than take action to ensure the responsible parties cured such defects

(during the cure period) or substituted or repurchased the affected loans, Wells Fargo stood

by while the Sponsors and Servicers of the Covered Trusts engaged in so called "robo-

signing" on a widespread basis when the missing documents were needed to foreclose on

properties underlying the Covered Trusts.

96.    Wells Fargo and the Sponsors and Servicers of the Covered Trusts have been

implicated in numerous governmental reports, court orders, and press reports regarding

servicing misconduct and the massive cover up of the failure to deliver documentation

concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and Wells Fargo's knowledge of such failures.

97.     For example, The Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision issued a report finding that Bank of America, and its affiliates, including Countrywide, routinely did not transfer the original mortgage loan documents to the issuing trusts for RMBS transactions.  Bank of America/Countrywide is a servicer for several of the Covered Trusts.  Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.

98.     As another example, on April 13, 2011, the Federal Reserve issued a Consent Order finding that GMAC, the servicer for HVMLT 2007-3, failed to document mortgage loans properly and attempted to cover-up this failure.  *In re Ally Financial Inc., Ally Bank & GMAC Mortg., LLC*, Consent Order, 11-20-B-HC, 11-020-B-DEO (Apr. 13, 2011), *available at* https://www.fdic.gov/bank/individual/enforcement/2011-04-77.pdf.

99.     In fact, a Texas state jury recently determined that Wells Fargo had knowledge of fraudulent documents being used to support a foreclosure brought in its capacity as trustee, and the improper foreclosure resulted in the borrowers being awarded nearly $5.4 million.  "Wells Fargo Must Pay $5.4M In Robosigning Foreclosure Row", Law 360: Nov. 12, 2015, *available at* http://www.law360.com/articles/726312/wells-fargo-carrington-must-pay-5m-in-foreclosure-row.

100.     Section III(D) contains a chart of the relevant Sponsors, Servicers, and Master Servicers for the Covered Trusts.  Wells Fargo's and the relevant Sponsors', Servicers', and

Master Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

101.    Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

102.    First, each PSA requires that the Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach.  For example, Section 7.01 of the BOA PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 30 days of notice of the breach.  The PSAs for the BOA, Citi, DLJ, EMC, Morgan Stanley, Greenwich, Option One, and WMC Trusts contain similar provisions. *See* Ex. C § IX.  The PSA for the BOA Trusts also provides that the Servicer's failure to perform its covenant to prudently service the mortgage loans ripens into a Servicer Event of Default if left uncured for a specified period after a servicing officer learned of such failures.

103.    As set forth above, and in Exhibit G, when borrowers defaulted and the Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan.  The Trustee was aware of this fact as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.  Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent Servicer would have insisted that the loans be

repurchased.  Having failed to provide notice, the Trustee had an obligation to act prudently to address all defaults.

104.    These Events of Default triggered Wells Fargo's duty to act prudently to protect the interests of the certificateholders in all respects and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  Wells Fargo had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted.  Wells Fargo also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  Wells Fargo has repeatedly breached these duties throughout its tenure as Trustee.

### 2.    Wells Fargo Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

105.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including Wells Fargo) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this Complaint, that loan Originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements.  The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" and "you must comply with your obligations . . . to take action to remedy the servicer

Events of Default in the best interests of the certificateholders."

106.    Further, on or about December 16, 2011, Wells Fargo received instructions from a group of institutional investors in hundreds of RMBS trusts asking Wells Fargo to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative").  The JPMorgan Putback Initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including WMC, and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts.  On October 1, 2014, Wells Fargo accepted the settlement with JPMorgan with respect to several Covered Trusts including GPMF 2006-AR1 and GPMF 2006-AR3, despite that the settlement would reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct.  *See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis, *JP Morgan Sets Tentative $45 Billion Accord for Mortgage Bonds*, Bloomberg (Nov. 16, 2013 12:00 AM), http://www.bloomberg.com/news/2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-deal-with-investors.html; List of Accepting Trusts and Loan Groups, *available at* http://www.rmbstrusteesettlement.com/docs/List_of_Accepting_Trusts_and_Loan_Groups.pdf.

107.    Additionally, on or about June 18, 2014, a group of institutional investors purporting to hold over 25% of the outstanding notes in RMBS, including many of the Covered Trusts, for which Wells Fargo serves as trustee filed suit providing Wells Fargo with notice of numerous defaults by the Servicers, Sponsors, and Originators.  Certificateholders also provided Wells Fargo with notice of specific ongoing Events of Default and demanded that

Wells Fargo take immediate action with respect to at least 149 RMBS issued by Wells Fargo. These RMBS contained loans originated by many of the same lenders that also originated loans underlying the Covered Trusts, including WMC, Option One, and Bank of America. *See* Compl., *BlackRock Allocation Target Shares v. Wells Fargo Bank Nat'l Ass'n*, 651867/2014 (N.Y. Sup. Ct. June 2014).

108.    Wells Fargo, in its capacity as servicer, received a letter from Deutsche Bank National Trust Company, the trustee of a trust not at issue in this litigation, regarding hundreds of loans in breach of WMC's representations and warranties. This letter advised Wells Fargo that "[b]ased on the number of material breaches of Representations in the statistically representative sample, we have determined a breach rate of 99.7%."

109.    Further, Servicers' failure to comply with their duties under the PSAs in response to these widespread breaches of representations and warranties constituted breaches of their duties under the PSAs, which have ripened into Events of Default.

110.    Wells Fargo has not acted prudently to ensure that certificateholders' interests are protected as it was required to do in response to these Events of Default.

**3.      Events of Default Concerning False Servicer Certifications**

111.    Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations. For example, Section 3.16 of the EMC PSA requires the Servicer to certify, among other things, that:

> (i)      a review of the activities of the Master Servicer during the preceding calendar year (or applicable portion thereof) and of the performance of the Master Servicer under this Agreement has been made under such officer's supervision and

> (ii)     to the best of such officer's knowledge, based on such review, the Master Servicer has fulfilled all its obligations under this Agreement in all material respects throughout such year (or

> applicable portion thereof), or, if there has been a failure to fulfill
> any such obligation in any material respect, specifying each such
> failure known to such officer and the nature and status thereof.

The PSAs for the BOA, Citi, DLJ, Greenwich, Morgan Stanley, Option One, and WMC

Trusts contain substantially similar requirements. *See* Ex. C § XII.

112.    The failure to provide a conforming certification is an Event of Default under

each of the PSAs. *See* Ex. C §§ IX, XII.  Wells Fargo was not entitled to rely on

certifications that it knew to be false, and thus, Wells Fargo's failure to provide notice of

breaches relating to false Servicer certifications triggered its post-Event of Default duties.

113.    Wells Fargo received certifications that it knew to be false because the

Servicers were not in fact meeting their obligations under the PSAs and failed to disclose

numerous representation and warranty violations.  As discussed in Sections III(B)(1) and

III(C), the Servicers breached the PSAs in many ways including by attempting to foreclose

on defective loans rather than tendering loans for repurchase or substitution and by looting

trust assets through multiple servicing scams.  As discussed in Section III(A), the Trustee

was aware of numerous representation and warranty violations that were not disclosed in the

required Servicer certifications.  The Trustee was aware of these breaches, and therefore,

knew the required Servicer certifications did not conform because they were false.  The

PSAs only allowed the Trustee to rely upon the certifications if it had a good faith basis to

believe the certifications were true.  Events of Default were triggered as a result and Wells

Fargo had a continuing duty to act prudently to protect the certificateholders' interests.

114.    In addition, under several of the PSAs, the Servicers provide a representation

and warranty that all reports provided under the PSA, including servicing compliance

certifications, were accurate and complete.  For example, Section 2.05 of the Citi PSA

provides:  "Neither this Agreement nor any information, certificate of an officer, statement furnished in writing or report delivered to the Trustee by the Service in connections with the transactions contemplated hereby contains any untrue statement of material fact."  All the parties to the PSA had a duty to provide notice of breach of this representation and warranty.  The Servicers' failure to provide such notice resulted in Event of Default triggering BNY Mellon's post-Event of Default duties.

### C. Wells Fargo Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets

115.    In addition to the servicing related defaults and Events of Default described above, the Servicers have engaged in a variety of schemes to overcharge borrowers in default.  These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Commerzbank's losses.

116.    The chart below identifies each of the entities disclosed to be the Sponsors, Servicers, and Master Servicers of the loans included in the Covered Trusts.

| | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| 1 | ABFC 2005-HE2 | Bank of America, N.A. | Saxon Mortgage Services, Inc. | |
| 2 | ABFC 2005-OPT1 | Bank of America, N.A. | Option One Mortgage Corp. | |
| 3 | ABFC 2006-OPT1 | Bank of America, N.A. | Option One Mortgage Corp. | |
| 4 | ABFC 2006-OPT2 | Bank of America, N.A. | Option One Mortgage Corp. | |
| 5 | ABSHE 2005-HE5 | DLJ Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP. | |
| 6 | BAFC 2005-C | Bank of America, N.A. | GreenPoint Mortgage Funding, Inc. | |

| | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| 7 | BOAMS 2006-B | Bank of America, N.A. | Bank of America, N.A. | |
| 8 | CMLTI 2005-OPT4 | Citigroup Mortgage Loan Trust Inc., | Option One Mortgage Corp. | |
| 9 | GPMF 2005-AR4 | EMC Mortgage Corp. | EMC Mortgage Corp. | |
| 10 | GPMF 2006-AR1 | EMC Mortgage Corp. | EMC Mortgage Corp. | |
| 11 | GPMF 2006-AR2 | EMC Mortgage Corp. | EMC Mortgage Corp. | |
| 12 | GPMF 2006-AR3 | EMC Mortgage Corp. | EMC Mortgage Corp. | |
| 13 | HVMLT 2007-3 | Greenwich Capital Financial Products, Inc. | GMAC Mortgage, LLC. | |
| 14 | MSAC 2005-WMC2 | WMC Mortgage Corp. | Countrywide Home Loans Servicing LP | |
| 15 | MSAC 2005-WMC3 | WMC Mortgage Corp. | Countrywide Home Loans Servicing LP | |
| 16 | MSAC 2005-WMC5 | WMC Mortgage Corp. | Countrywide Home Loans Servicing LP | |
| 17 | MSAC 2006-HE1 | Morgan Stanley Mortgage Capital Inc. | JP Morgan Chase Bank, N.A. | |
| 18 | OOMLT 2006-2 | Option One Mortgae Acceptance Corp. | | Option One Mortgage Corp. |

117.    From 2005 until today, the Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee

third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured.

118.    When a defaulting borrower's home is foreclosed upon and sold, the Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

119.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard and were not disclosed in annual certifications provided by the Servicers.  As noted in Sections III(B)(1) and III(B)(3), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently. Wells Fargo was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

120.    Further, Wells Fargo was aware of these servicing scams as it engaged in the same servicing misconduct itself and has been subject to settlements with government regulators similar to those of the Servicers of the Covered Trusts.  *See, e.g.,*  Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.  (Wells Fargo was one of the five servicers who settled allegations relating to their servicing misconduct).

121.    Exhibit H summarizes servicing misconduct involving the relevant Servicers

and Master Servicers.

## IV.    WELLS FARGO SUFFERED FROM CONFLICTS OF INTEREST

122.    Wells Fargo failed and unreasonably refused to take action to protect the Covered Trusts and certificateholders against Originator breaches and Servicer violations because it would have exposed that Wells Fargo was engaged in the same misconduct in its role as Servicer for other mortgages and RMBS trusts.

123.    During the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Wells Fargo's foreclosure processes.  The reviews uncovered significant problems in Wells Fargo's foreclosure processing, including "critical weaknesses" in Wells Fargo's foreclosure practices and oversight of default services vendors.  *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

124.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring Wells Fargo to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board press release, "These deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [Wells Fargo]."  The enforcement action required Wells Fargo to improve its residential mortgage loan servicing and foreclosure practices.  As part of the enforcement action, Wells Fargo entered into a consent order with the Federal Reserve Board, which found that Wells Fargo had engaged in "unsafe or unsound practices with respect to the manner in which [Wells Fargo] handled various foreclosure and related

activities."

125.    In addition, the Office of the Comptroller of the Currency entered into consent

orders with Wells Fargo and several other servicers (the "OCC Consent Orders").  The OCC

Consent Order with Wells Fargo discussed how Wells Fargo was among the largest

servicers of residential mortgages in the United States, and serviced a portfolio of 8.9

million residential mortgage loans.  In the OCC Consent Order with Wells Fargo, the OCC

found that there were "deficiencies and unsafe or unsound practices in residential mortgage

servicing and in the Bank's initiation and handling of foreclosure proceedings."  Further,

Wells Fargo filed false or otherwise defective affidavits in connection with foreclosure

proceedings and failed to exercise adequate oversight, internal controls, policies and

procedures, compliance risk management, internal audit, third-party management, and

training for its foreclosure-related services.  *See In re Wells Fargo Nat'l Ass'n*, Consent Order,

AA-EC-11-19 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-

releases/2011/nr-occ-2011-47j.pdf.

126.    Further, several municipalities have brought actions alleging that predatory

lending with respect to mortgage loans originated by Wells Fargo resulted in significant

levels of foreclosures, which caused "urban blight" as the properties fell into disrepair.  *See,

e.g.,* Compl., *City of Baltimore v. Wells Fargo Bank, N.A.*, L08-cv-062 (D. MD. Jan. 1,

2008); Compl., *City of Memphis v. Wells Fargo Bank, N.A.*, 2:09- cv-02857 (W.D. Tenn.

Dec. 30, 2009).

127.    Because Wells Fargo was engaging in the same illicit and improper acts as

the Servicers for the Covered Trusts, Wells Fargo failed to enforce the Servicer violations,

or even alert the certificateholders to the Servicers' misconduct in order to not expose its

own similar misconduct.

## V.   **WELLS FARGO'S CONDUCT INJURED COMMERZBANK**

128.   Wells Fargo's breaches of its contractual, statutory, and fiduciary duties have caused Commerzbank in excess of $100 million of losses.

129.   If Wells Fargo had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Commerzbank's losses.  And if Wells Fargo had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

130.   Wells Fargo's failure to address the Servicers' failure to adhere to prudent servicing practices also increased the loss severities (i.e., the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders.  The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicers from foreclosure sale proceeds.

131.   If Wells Fargo had met its contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required, and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Sponsors, Depositors, and Originators failed to

deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, Wells Fargo's failure to take delivery of complete note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates. Additionally Wells Fargo's failure to commence damages actions against the Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

132.    Wells Fargo's breaches with respect to the Sold Certificates significantly reduced the sale price Commerzbank ultimately received when it divested itself of the Certificates. When the sales were made it was apparent that Wells Fargo had breached its duties and would not take steps to remedy its failures. The sales of the Sold Certificates were made by London Branch and the economic losses from those sales were experienced in Commerzbank in England and/or in Germany where Commerzbank is located. The sale of the Sold Certificates did not include assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against Wells Fargo.

133.    Wells Fargo's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If Wells Fargo had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Servicers to replace the assets they have looted from the Covered Trusts.

50

134.    Many, if not all, of the repurchase or substitution claims described above have lapsed due to Wells Fargo's inaction as courts have held that the underlying representation and warranty claims that Wells Fargo failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitizations.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Violations of the TIA)[5]

135.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

136.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Wells Fargo is an "indenture trustee" under the TIA.  15 U.S.C. § 77aaa(7), (10).

137.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the TIA.

138.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

139.    Wells Fargo violated the TIA in at least three ways.

140.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, Wells Fargo failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to

---

[5] Commerzbank acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here.  Plaintiffs include a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

141.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, Wells Fargo did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

142.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  Wells Fargo has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, Wells Fargo has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

143.    These breaches materially and adversely affected the interests of the certificateholders, including Commerzbank, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible

parties.

144.    Wells Fargo is liable to Commerzbank for damages incurred as a result of Wells Fargo's violations of the TIA in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**(Breach of Contract)**

145.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

146.    The PSAs are valid and binding contracts entered into between Wells Fargo, each Covered Trust, the Sponsors, the Servicers, and the Depositors.

147.    The PSAs provide, among other things, the terms under which Wells Fargo acts as trustee for the Covered Trusts.

148.    As current holders and/or former holders of Certificates or Notes issued by each Covered Trust, Commerzbank is or was an express, intended third-party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

149.    Wells Fargo breached several obligations that it undertook on behalf of Commerzbank as certificateholder including, without limitation, to:

> (a)    take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase;

> (b)    investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

> (c)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

> (d)    provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e)     enforce the repurchase obligations of the Sponsors and/or Originators.

150.    The specific provisions breached by Wells Fargo are further detailed herein and in the Exhibits hereto.

151.    Wells Fargo's breach of its duties set forth in the PSAs, as described above, caused Commerzbank's losses on its Certificates and diminished their value.

152.    Commerzbank has performed its obligations under the PSAs.

153.    Wells Fargo is liable to Commerzbank for the losses it suffered as a direct result of Wells Fargo's failure to perform its contractual obligations under the PSAs.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

154.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

155.    As set forth in detail above, Wells Fargo owed certificateholders, including Commerzbank, a fiduciary duty to act in good faith, avoid conflicts of interests when performing the obligations set forth in the PSAs and to exercise all powers under the PSAs prudently to protect certificateholders' rights once an Event of Default occurred or payments to certificateholders became impaired.  This included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators.

156.    As set forth in detail above, Wells Fargo breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

157.    The violations by Wells Fargo of its fiduciary obligations impaired

certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Commerzbank's Certificates.

## FOURTH CAUSE OF ACTION
### (Negligence—Failure to Avoid Conflicts of Interest and Perform Ministerial Acts with Due Care)

158.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

159.     Wells Fargo owed certificateholders, including Commerzbank, extra-contractual duties to perform ministerial acts with due care, and avoid conflicts of interests. As described above, Wells Fargo performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

160.     Wells Fargo's negligence and gross negligence impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Commerzbank's Certificates.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)

161.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

162.     As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

163.     The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

164.     The PSAs underlying and establishing the Covered Trusts are "indentures,"

and Wells Fargo is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

165.     Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

166.     As set forth above, Wells Fargo failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

(a)      protect the interests of the beneficiaries of the Covered Trusts;

(b)      take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(c)      investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(d)      make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(e)      provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(f)      enforce the repurchase obligations of the Sponsors and/or Originators.

167.     Wells Fargo is liable to Commerzbank for damages incurred as a result of Wells Fargo's violations of the Streit Act.

<u>**SIXTH CAUSE OF ACTION**</u>
<u>**(Breach of the Covenant of Good Faith)**</u>

168.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

169.     At all relevant times, Wells Fargo owed Commerzbank, as an express, intended

third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the

PSAs that required Wells Fargo to ensure that it did not, by act or omission, injure the rights of

Commerzbank to receive the benefits and protections provided for under the PSAs.

170.   By the conduct described above, Wells Fargo breached its duty of good faith and

fair dealing under the PSAs.

171.   Wells Fargo's breaches are material.

172.   As a result of these breaches, Commerzbank has suffered damages and will

continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Commerzbank prays for relief and judgment, as follows:

A.   Awarding compensatory damages and/or equitable relief in favor of

Commerzbank against Wells Fargo for breaches of its statutory, contractual, and fiduciary

duties, its gross negligence, ordinary negligence, and negligent misrepresentations, in an

amount to be proven at trial, including interest thereon;

B.   Awarding Commerzbank its reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

C.   Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Commerzbank hereby demands a trial by jury on all issues triable by jury.


Dated:  December 23, 2015

Respectfully submitted,

/s/    David H. Wollmuth_____
David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane

57

Robert T. Franciscovich
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
rfranciscovich@wmd-law.com

*Attorneys for Plaintiff*